UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION


TERESA A. HARRIS,                              CASE NO. 1:09-cv-466
        PLAINTIFF                              (SPIEGEL, Sr. J.)
                                               (HOGAN, M. J.)
        VS.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
        DEFENDANT


## REPORT AND RECOMMENDATION

Plaintiff filed her application for disability insurance benefits in September, 2005. Her application was denied, both initially and upon reconsideration. She requested and obtained a hearing before an Administrative Law Judge (ALJ) in September, 2008 at Dayton, Ohio. Plaintiff, who was represented by counsel, testified, as did Medical Expert (ME), Dr. Hershel Goren, a retired neurologist, and Vocational Expert (VE), Eric Pruit. The ALJ reached an unfavorable result in October, 2008. Plaintiff processed an appeal to the Appeals Council, which denied review in May, 2009. Plaintiff timely filed her Complaint seeking judicial review in July, 2009.


## STATEMENT OF ERRORS

There is but a single Statement of Error, phrased as "Issues Presented," and it is that the ALJ erred in failing to find any severe impairment, specifically, mitochondrial myopathy. Inherent in this argument is the implication that the ALJ also erred in failing to find the above impairment disabling. The second Statement of Error, although stated as a part of the first, is that the ALJ erred in overstating Plaintiff's daily activities.


## PLAINTIFF'S TESTIMONY AT THE HEARING

Plaintiff stated that she last worked in 2004, doing factory work for Amtex in Lebanon,

Ohio. Plaintiff molded carpet for the automobile industry. Prior employment was at Blue Ribbon Property Maintenance, doing snow and trash removal and landscaping. She was also employed by Wilmington City Schools as a janitor, by Mitsubishi Electric as an assembler and by Dow Chemical cleaning steel hoppers. Plaintiff graduated from Northwest High School in 1983.

Plaintiff complained of polyneuropathy, diabetes and generalized pain, muscle spasm and paralysis. The locus of the pain is her legs, arms, neck and hips. She also complained of fatigue and muscle weakness. The diagnosis of mitochondrial deficiency was made by physicians at the Cleveland Clinic and was based on a muscle biopsy of the left thigh. She sees Tom Tigar, M.D. an internist, locally, and three physicians at the Cleveland Clinic, including Sumit Parikh, M.D. and Bruce Cohen, M.D., neurologists. Treatment has been with medications.

Plaintiff testified that her typical day involves taking two naps. She is able to do one load of laundry and make a bed before needing to rest. She is able to start preparing dinner, but requires help completing that task. She is able to grocery shop only for an item or two, but can't walk through the whole store. Repetitive arm movements cause her muscles to lock up, so a battery-operated toothbrush was purchased to facilitate the function of brushing her teeth. She is able to walk for 1/2 block before the onset of fatigue. Plaintiff estimated that she could stand for 10-15 minutes.

Plaintiff denied being able to work, even at a sit-down job, and stated that she has more bad than good days, a situation that has reversed since she was first diagnosed. (Tr., Pgs. 20-39).

## THE MEDICAL EXPERT

Dr. Goren testified that his review of the record showed that Plaintiff had no severe impairments, no restrictions and failed to meet either Listing 11.13 or 14.05. Dr. Goren cited to a normal electromyogram and physical examination, and a passage from Dr. Chamblee at the Cleveland Clinic describing minimal muscle weakness. It was disclosed upon cross-examination that Dr. Goren did not review Dr. Cohen's records of May 18, and June 5, 2007 from the Cleveland Clinic, or the results of a May 5, 2006 muscle biopsy.

## THE OPINION OF THE ADMINISTRATIVE LAW JUDGE

The ALJ concluded that Plaintiff's medically determinable impairments included Type II

Diabetes Mellitus and the residuals of low back surgery and that neither should be classified as severe. Therefore, disability status was denied.

### THE MEDICAL RECORD

Plaintiff saw John Feibel, M.D., a neurologist, in January, 2005. She complained of incontinence as well as cramping, stiffness and weakness in her legs. She was referred to Dr. Deborah Fritz, a rheumatologist. Dr. Feibel reviewed her EMGs and MRIs and laboratory work and found no major neurologic problem. His diagnosis was "lumbosacral disc displacement with radiculopathy." Neurontin and Baclofen were prescribed. (Tr., Pg. 130). The MRI was conducted in November, 2005 , showed "minimal granulation tissue present at the postoperative site of L5-S1" and no evidence of disc herniation, arachnoiditis or spinal stenosis. (Tr., Pg. 137). Dr. Feibel reported that an MRI of the neck "failed to show any narrowing." (Tr., Pg. 135). In November, 2005, Dr. Feibel reported that "Every tests that we can figure to do treatable of neuropathy has been done and has been negative." (Tr., Pg. 139). In October, 2005, Dr. Feibel reported that he could not locate any muscle weakness and that Plaintiff had "no pathological reflexes." (Tr., Pg. 144). In October, 2005, nerve conduction studies of Plaintiff's left arm and left leg were "unremarkable." (Tr., Pg. 146).

In October, 2005, Dr. Feibel reported that Plaintiff had back surgery 4 years previous with Dr. Thomas Saul. She complained of pain in both legs and in her back as well as muscle spasm in the left leg. (Tr., Pg. 147). Dr. Feibel stated: "She appears to have neuropathy, but I am concerned about the possibility of myelopathy." (Tr., Pg. 148).

Deborah A. Fritz, M.D., reported in December, 2004 that Plaintiff complained of low back and hip pain, starting in March, 2004. Plaintiff reported leg stiffness and soreness in both legs and her left arm, as well as an inability to move her legs. Dr. Fritz said that "neurologic evaluation (MRI of the brain and spine plus EMG/nerve conduction studies of the arms and legs) has been negative." Dr. Fritz found no muscle weakness or evidence of fibromyalgia, but Plaintiff's complaint of flu-like symptoms led her to suggest that Plaintiff may have a viral syndrome. She prescribed a "short course of Prednisone," a steroid. (Tr., Pgs. 150-151).

Brain Ondulick, D.O., saw Plaintiff at the request of Tommy Tigar, M.D. in March, 2005. Dr. Ondulick found "no appreciable neurological deficit" and diagnosed Plaintiff with "chronic

lower extremity weakness and pain." He recommended a "left gastrocnemius muscle biopsy." (Tr., Pgs. 152-153).

Anton Freihofner, M.D., a paper reviewer, said that a "fairly extensive work up has not revealed a cause for Plaintiff's complaint." Dr. Freihofner's opinion was that Plaintiff had no severe impairments. (Tr., Pg. 154). Gary Hinzman, M.D. agreed and indicated that "the physical findings remain normal, normal strength, normal gait, no severe medical impairment." (Tr., Pgs. 154-155).

In March, 2005, a gastrocnemius muscle biopsy was performed on Plaintiff's left leg because that is the leg reported to be most weak. Brian Ondulick, D.O. was the surgeon. The biopsy showed "no gross muscle abnormalities." Dr. Ondulick reported that prior visits to a neurologist and rheumatologist "did not result in a diagnosis." (Tr., Pgs. 167-168).

An MRI of the thoracic spine was done in December, 2004. The results showed "no demonstrable disease of the thoracic spine." (Tr, Pg. 175). An MRI of the lumbar spine, taken in November, 2004, after Plaintiff complained of decreased feeling in her arms and legs, showed "Disco vertebral degenerative marrow changes at the L5-S1 level, no compromise of the theca sac, no disc extrusion or spinal stenosis, minimal granulation tissue is present at the postoperative site, no evidence of disc herniating or arachnoiditis." (Tr., Pgs. 176-177). X-rays of the cervical spine, performed in October, 2005, showed "no evidence of acute bony cervical spine abnormality." (Tr., Pg. 178). Another MRI of the cervical spine in October, 2004, showed that "The bony alignment of the cervical spine is within normal limits. The signal of the craniocervical junction and the cervical spinal chord is normal. Incidental note is made of some prominent soft tissues in the expected adenoidal region." (Tr., Pgs. 179-180). An MRI of the brain, taken in August, 2004, demonstrated "no demonstrable disease of the intracranial structures." (Tr., Pg. 181). An MRI of the left shoulder, taken in August, 2004, showed a "healed fracture of the left shoulder." (Tr., Pg. 182). An MRI of the lumbar spine in March, 2004, showed "postsurgical changes at the level of L5-S1, including granulation tissue, but no evidence of recurrent disc herniating." (Pgs. 183-184). X-rays of the lumbar spine in March, 2004 showed "degenerative changes at the level of L5-S1 with curvature of the lumbar spine that may be positional." (Tr., Pg. 185). X-rays of the left hip in March, 2004 were normal. (Tr., Pg. 186).

Plaintiff was referred by Dr. Tigar to the Cleveland Clinic in August, 2005. Her complaint

was constant pain (rated as a "7" on a 10-point scale) and numbness in the shoulders, neck, back, arms, hips and legs. The pain had lasted for 18 months. Her history related that she had been diagnosed with diabetes, but it was controlled by diet. Her father had diabetic neuropathy. Physicians at the Clinic suspected a myopathy rather than neuropathy, but diagnosed her with a "mitochondrial enzyme defect," based on lab work. (Tr., Pgs. 193-209).

Dr. Tigar reported in April, 2007 that Plaintiff suffers from a mitochondrial enzyme defect, which was diagnosed at the Cleveland Clinic. Dr. Tigar stated that Plaintiff, who complained of pain and weakness, has "defects in citrate synthase and complex III deficiency," which allow her to only sustain muscular activity for short periods of time. She also has "peripheral neuropathy as verified by an abnormal EMG." Dr. Tigar stated his opinion that "Mrs. Harris is not employable." (Tr., Pg. 216). Office notes show that Plaintiff presented on an almost monthly basis from January, 2005 to September, 2007 to Dr. Tigar with complaints of muscle pain and weakness. She was treated with medications such as Neurontin, Oxycontin, Baclofen and Percocet (Tr., Pgs. 210-237). Subsequent office notes from December, 2007 to March, 2008 show the same symptoms and treatment regime. (Tr., Pgs. 239-245).

Bruce Cohen, M.D. of the Cleveland Clinic reported in October, 2007 that Plaintiff's "history is suggestive of a mitochondrial issue." Dr. Cohen stated that Plaintiff's "functional status is quite impaired even though she looks well." His diagnosis was "myopathy due to mitochondrial disease." Dr. Cohen believed Plaintiff to be disabled. (Tr., Pg. 238).

Plaintiff was seen by Sumit Parikh, M.D. in April, 2008. Dr. Parikh's diagnosis was myopathy, myalgia and myositis as well as a mild cognitive impairment. (Tr., Pgs. 246-258).

A repeat MRI of the cervical spine, done in April, 2008, was normal. (Tr., Pg. 258).

A Functional Capacity Evaluation was done in April, 2008 by Marie Soha, MPT at the Cleveland Clinic. Plaintiff complained of constant whole body pain, particularly in the arms and legs. She displayed a "severe level of depression." and "significant antalgia." Plaintiff had lumbar disc surgery in 2001, consulted numerous neurologists and finally was diagnosed with a "mitochondrial disorder," the onset of which was sudden. She estimated that she could sit for 60 minutes, stand for 10 minutes and walk for 10 minutes. She exhibited a "poor gait quality" and had a "moderate decrease in lumbar range of motion." Her lifting capacity was 10 lbs. on an occasional basis, sitting capacity was 65 minutes, standing capacity was 9 minutes and walking

capacity was 6 minutes. Plaintiff tested "below normal" on all functional movement tests except for the reach test. During a test of whole body range of motion, Plaintiff showed a "decreased fine motor use of her hands and fingers. Results of three lifting tests placed Plaintiff at the sedentary level as her capacity for occasional lifting was 11 lbs. Effort testing evaluates grip strength and stability of the arms, shoulders and neck. The conclusion was that Plaintiff put forth "less than maximum voluntary effort,"which indicates the existence of "an unidentified impairment, easy fatigue-ability, test anxiety, fear of reinjury or patient demonstrating symptom magnification." (Tr., Pgs. 250-266).

In May, 2006, Kenneth Marks, M.D., performed a quadriceps biopsy on Plaintiff's left thigh. Plaintiff had some physical inabilities as a child and had back surgery in 2001, but in 2004 developed sudden onset weakness that began in her legs and spread to her arms and neck in a period of months. Postoperative diagnosis enabled Dr. Marks to rule out mitochondrial myopathy. (Tr., Pg. 267).

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case. Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for disability insurance benefits, plaintiff must meet certain insured status requirements, be under age 65, file an application for such benefits, and be under a disability as defined by the Social Security Act. 42 U.S.C. §§ 416(i), 423. Establishment of a disability is contingent upon two findings. First, plaintiff must suffer from a medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Second, the

impairments must render plaintiff unable to engage in the work previously performed or in any other substantial gainful employment that exists in the national economy. 42 U.S.C. § 423(d)(2).

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

A severe impairment or combination of impairments is one which significantly limits the physical or mental ability to perform basic work activities. 20 C.F.R. §404.1520(c). Basic work activities relate to the abilities and aptitudes necessary to perform most jobs, such as the ability to perform physical functions, the capacity for seeing and hearing, and the ability to use judgment, respond to supervisors, and deal with changes in the work setting. 20 C.F.R. §404.1521(b). Plaintiff is not required to establish total disability at this level of the evaluation. Rather, the severe impairment requirement is a threshold element which plaintiff must prove in order to establish disability within the meaning of the Act. *Gist v. Secretary of H.H.S.*, 736 F.2d 352, 357 (6th Cir.1984). The severity requirement may be employed as an administrative convenience to screen out claims that are totally groundless solely from a medical standpoint. *Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988)(per curiam). An impairment will be considered nonsevere only

if it is a "slight abnormality which has such minimal effect on the individual that it would not be
expected to interfere with the individual's ability to work, irrespective of age, education, and work
experience." *Farris v. Secretary of H.H.S.*, 773 F.2d 85, 90 (6th Cir. 1985)(citing *Brady v.
Heckler*, 724 F.2d 914, 920 (11th Cir. 1984)).  The Secretary's decision on this issue must be
supported by substantial evidence. *Mowery v. Heckler*, 771 F.2d 966 (6th Cir. 1985)

## OPINION

The ALJ's finding that Plaintiff had no severe impairment is the subject of Plaintiff's sole
Statement of Error. The ALJ's conclusion was based on the opinion of the ME, Dr. Goren, a
neurologist, who testified at the hearing in September, 2008, but who made no mention of certain
records from the Cleveland Clinic, to wit: the evaluation report of May 18, 2007 or the addendum
of June 5, 2007, and the May 2006 Quadriceps biopsy performed by Dr. Marks.  The ALJ's
opinion was also based on a somewhat unrealistic interpretation of what Plaintiff actually said in
her testimony and in the history given to several physicians that she attempts to do one load of
wash per day, but is unable to carry laundry baskets; that she is able to vacuum one room at a
time; that she is able to cook, but can't stand long enough to finish cooking.  Plaintiff testified that
she is able to shop for a few items, but lacks the endurance to shop on a more extensive basis and
needs her husband's help.  Plaintiff's testimony is entirely consistent with what she related to
physicians when she was expecting treatment.  It is also consistent with the diagnosis obtained by
the Cleveland Clinic, an enzyme deficiency which causes muscle fatigue.  Contrary to the ALJ's
view, Plaintiff's everyday activities do support the proposition that her impairment is severe
because her impairment obviously significantly limits Plaintiff's ability to perform the basic work
activities of walking, standing and lifting.

As noted above, at the second step, a claimant must demonstrate he or she has at least one
"severe" "medically determinable" physical or mental impairment that meets the "duration"
requirement to continue with the remaining steps in the disability determination. 20 C.F.R. §§
404.1520(a)(4)(ii) and (c), 416.920(a)(4)(ii) and (c); Higgs *v. Bowen,* 880 F.2d 860, 863 (6th
Cir.1988) (per curiam). A physical or mental impairment is "severe" if it significantly limits the
claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520(a)(4)(ii) and (c),

416.920(a)(4)(ii) and (c); Social Security Ruling 96-3p; Social Security Ruling 96-4p; *Higgs,* 880 F.2d at 863. Notably, if the impairment does not satisfy the "severe" requirement then it is considered "non-severe" or "not severe". 20 C.F.R. §§ 404.1521(a), 416.921(a); *Higgs,* 880 F.2d at 862; *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 89-90 (6th Cir.1985).

Plaintiff testified at the hearing that she suffers from severe impairments including a "Complex III deficiency of the mitochondrial system." (Tr. Pg. 31). The ALJ found that the plaintiff has the medically determinable impairments of Type II diabetes Mellitus and residuals of low back surgery. (Tr. Pg. 17). The ALJ then concluded that neither of these impairments are "severe" and therefore determined that plaintiff was not disabled within the meaning of the Act. (Id.). The ALJ never addressed whether the plaintiff suffers from myopathy, a mitochondrial defect or mitochondrial disease, and if so, whether such medically determinable impairment is "severe." Medical reports from Drs. Cohen and Parikh, both specialists with the Cleveland Clinic, support a finding that plaintiff has a medically determinable impairment of myopathy. Dr. Cohen's diagnosis was "myopathy due to mitochondrial disease." (Tr., Pg. 238). Dr. Parikh's diagnosis was myopathy, myalgia and myositis as well as a mild cognitive impairment. (Tr., Pgs. 246-258). These diagnoses were based in part on a May 2006 biopsy report which Dr. Goren never reviewed and testing and examinations conducted by these doctors, including Dr. Cohen's May 18, 2007 Report and June 5, 2007 Addendum Report. While Dr. Cohen testified at the hearing that he found no severe impairment based on these diagnoses, he never reviewed the May and June 2007 Reports from Dr. Cohen. He also testified that Dr. Cohen never assigned a "number" to the plaintiff's muscle strength upon examination. And that based on Dr. Chamblee's assessment, any impairment would be non-severe. This testimony in contradicted by Dr. Cohen's May and June 2007 Reports and his referral to a physical therapist for specific testing of muscle strengths.

Step 2 of the sequential analysis-determining whether the claimant has a severe impairment-presents "a *de minimis* hurdle in the disability determination process.... Under the ... *de minimis* view, an impairment can be considered not severe only if it is a slight abnormality that minimally affects work ability regardless of age, education, and experience." *Higgs v. Bowen,* 880 F.2d at 862. The purpose of this very low evidentiary hurdle is to "screen out claims that are

'totally groundless.' " *Higgs,* 880 F.2d at 862 (quoting in part *Farris v. Secretary of Health and Human Services,* 773 F.2d 85, 89-90 (6th Cir.1985)). The *Higgs* Court characterized the dismissal of a disability claim at Step 2 based on medical evidence alone as "exceptional." 880 F.2d at 863; *Schulten v. Commissioner of Social Sec*. 2009 WL 891770, 8 (S.D. Ohio 2009).    In this case, the ALJ failed to directly address whether plaintiff suffers from a medically determinable impairment of myopathy and or mitochondrial disease/disorder and whether such impairment is severe.  The record contains evidence from her treating doctors that plaintiff does have such an impairment. Neither the Social Security reviewing physicians nor the Medical expert who testified at the hearing had all the available medical records on this issue.  Accordingly, the ALJ's decision rejecting plaintiff's claim at Step Two is not supported by substantial evidence.

## CONCLUSION

Because the decision by the Administrative Law Judge is not supported by substantial evidence and because disability is not clearly established, the case should be remanded for further proceedings.

June 8, 2010

Timothy S. Hogan
United States Magistrate Judge

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

TERESA A. HARRIS,
            PLAINTIFF

VS.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
            DEFENDANT

CASE NO. 1:09-cv-466
            (SPIEGEL, Sr. J.)
(HOGAN, M. J.)

## NOTICE TO THE PARTIES REGARDING THE FILING OF OBJECTIONS TO THIS R&R

Pursuant to Fed. R. Civ. P. 72(b), within fourteen (14) days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. This period may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed. 2d 435 (1985).